UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE BROWN,

                Plaintiff,                        Civil Action No. 4:12-cv-14057

       v.                                District Judge Gershwin A. Drain
                                              Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION TO REMAND FOR
## FURTHER ADMINISTRATIVE PROCEEDINGS

Plaintiff Catherine Brown suffers from a variety of medical conditions and has a long history of treatment for them. Based on her spinal problems, fibromyalgia, anxiety, and depression Brown maintains that she is unable to work. So Brown filed for disability insurance benefits and supplemental security income under the Social Security Act. An administrative law judge, acting on behalf of the Defendant Commissioner of Social Security, thought that Brown was not under a "disability" as that term is used in the Act. Brown appeals that conclusion here. (*See* Dkt. 1, Compl.)

Brown proceeds pro se in this case and has not filed a motion for summary judgment. Nor has the Commissioner. As explained below, it has been this magistrate judge's practice in cases where a pro se, social-security-benefits plaintiff has failed to file a summary judgment motion to nonetheless review the administrative record and the Administrative Law Judge's narrative, and then determine whether the ALJ's findings are supported by substantial evidence and whether the ALJ made an obvious legal error. A review of the record reveals that the ALJ deciding Brown's case committed legal error by failing to obtain a medical expert's opinion on whether Brown's

impairments, in combination, medically equaled one of the Social Security Administration's listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. As such, the Court RECOMMENDS that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

### A. Procedural History

In August 2008, Brown applied for disability insurance benefits and supplemental security income asserting that she became unable to work on September 1, 2007. (Tr. 10.) After her application was denied, Brown requested a hearing before an administrative law judge. On December 17, 2010, Brown testified before Administrative Law Judge Anthony B. Roshak. (Tr. 26-51.) After listening to Brown's testimony and reviewing the administrative record, on February 22, 2011, ALJ Roshak determined that Brown was not under a "disability" as that term is used in the Social Security Act. (*See* Tr. 10-20.) That decision became the final decision of the Commissioner on July 12, 2012, when the Social Security Administration's Appeals Council denied Brown's request for further administrative review. (Tr. 1.) This suit followed. (Dkt. 1, Compl.)

### B. Medical Evidence

Brown received robust medical treatment during the three-and-a-half year disability period that ALJ Roshak considered. As such, the administrative record is long. The length of the following summary reflects the underlying record.

*Treatment for Pelvic Pain and October 2008 Hysterectomy*

During 2007, Brown treated at medical offices directed by Dr. Alex Pickens, Jr., an obstetrician and gynecologist. In September 2007, someone in Dr. Pickens' office assessed Brown

2

with anxiety, dysmenorrhoea, pelvic pain, and chronic hypertension. (Tr. 275.) In November 2007, because Brown was still reporting pelvic pain and vaginal bleeding, Dr. Pickens referred her for a sonogram. (Tr. 273.) It revealed a "large 5.5 [centimeter] posterior wall fibroid" and a "likely" paraovarian cyst. (*Id.*)

In May 2008, Dr. Pickens completed a form for Michigan's Department of Human Services. (Tr. 599.) He opined that because of Brown's arthritis, hypertension, and uncontrolled anxiety that she could not work at any job. (*Id.*) When asked how long, Dr. Pickens answered, "lifetime." (*Id.*)

Throughout the disability period, Brown regularly saw her primary-care physician, Dr. Richard Kushner. In April 2008, Brown told Dr. Kushner—whose notes are often illegible—that she was having difficulty swallowing and experiencing low pelvic pain. (Tr. 270.) Dr. Kushner's diagnoses were esophageal blockage, rule out ovarian mass, fibrosis uterus, and high blood pressure." (Tr. 270.) Dr. Kushner referred Brown for a chest x-ray; it was "normal." (Tr. 269.) It appears that Dr. Kushner made referrals for Brown's esophagitis and pelvic pain. (Tr. 264.)

In late May and early June 2008, diagnostic tests were performed to evaluate Browns' esophagitis and pelvic pain. Brown underwent an esophagram; the study physician's equivocal impression was "[m]ild, short peptic stricture of the [esophagogastric junction]?" The radiologist who performed an ultrasound of Brown's pelvis thought the study was "suggestive of multiple fibroids" and that it revealed a "1.2 cm left ovarian follicle." (Tr. 261.)

In June and October 2008, Brown underwent two surgical procedures to treat her pelvic pain. In June, Dr. Pickens performed a dilation and curettage and a diagnostic laparoscopy. (Tr. 250-52.)[1]

---

[1]"Dilation and curettage . . . is a procedure in which [a] doctor removes tissue from the inside of [the] uterus." Mayo Clinic Website, *Dilation and Curettage (D&C)*, http://www.mayoclinic.com/health/ dilation-and-curettage/MY00345 (last visited Nov. 27, 2013).

In the weeks following this procedure, Brown experienced vaginal bleeding. (*See* Tr. 257-58.) In August 2008, Dr. Pickens noted that Brown was "still spotting" and unable to obtain medication to stop her bleeding. (Tr. 257.) He scheduled Brown for a total vaginal hysterectomy. (*Id.*) In October 2008, Dr. Annette Coleman performed a supracervical hysterectomy. (Tr. 338-41.)

   *Brown Begins Treating with Dr. Bandemer for Back Pain*

   In November 2008, Brown underwent a lumbar-spine MRI. (Tr. 379.) The study showed a "diffuse disc bulge with a small annular tear" at L5-S1, but there was no evidence of focal disc herniation or central canal stenosis. (*Id.*) And the vertebral joints from L1 through L5 were "unremarkable." (*Id.*)

   Shortly after her MRI, Dr. Dennis Bandemer, on referral from Dr. Kushner, evaluated Brown. (Tr. 377-78.) Brown reported that her back and pelvic pain started in 2001 for unknown reasons. (Tr. 377.) Brown informed Dr. Bandemer that, at some point, she was told that a "rotated uterus" caused the pain. (*Id.*) Brown explained, however, that she still had pain even after her hysterectomy. (*Id.*) On exam, Brown revealed "some difficulty standing fully erect" and "ambulat[ed] with [a] slightly stooped posture." (Tr. 378.) Dr. Bandemer also noted "some tenderness" over the L5-S1 junction. (*Id.*) Brown could, however, heel and toe walk and squat without difficulty. (*Id.*) Brown had a negative straight-leg test and "[m]anual muscle testing [was] 5/5 proximally and distally in both lower extremities." (*Id.*) Dr. Bandemer diagnosed "[c]hronic right low back pain with some radiation into the pelvis and leg possibly L5-S1 stenosis based on the MRI and/or underlying sacroiliac dysfunction." (*Id.*) Dr. Bandemer scheduled Brown for an epidural

---

A "[d]iagnostic laparoscopy is a surgical procedure doctors use to view a woman's reproductive organs." Cleveland Clinic Website, *Diagnostic Laparoscopy*, http://my.clevelandclinic.org/ services/laparoscopic_diagnostics/ hic_diagnostic_laparoscopy.aspx (last visited Nov. 27, 2013).

injection, referred her for physical therapy, and provided samples of Celebrex to supplement the Vicodin that Brown was already taking. (*Id.*)

Brown received the first of four epidural injections on December 9, 2008. (Tr. 376.) It provided only short-term relief: by late December, Brown had started taking "high amounts of medication again, up to three Vicodin ES per day." (Tr. 375.)

On January 15, 2009, Brown received a second epidural injection. (Tr. 374.) This too provided only temporary relief. At her visit with Dr. Bandemer about two weeks after the injection, the physician noted that the shot had initially provided Brown "very good improvement" but, "over the last few days, her pain ha[d] . . . increased." (Tr. 370.) Brown had been attending physical therapy, which Dr. Bandemer noted was "helpful." (*Id.*) On exam, Brown moved "very slowly" and was "very stiff with guarded movements." (*Id.*)

On February 3, 2009, Brown received a third injection. (Tr. 369.) Yet, six days later, Brown saw Dr. Kushner for back pain and muscle spasms. (Tr. 486.) Although Dr. Kushner's impressions (menopause, high blood pressure, and asthma) did not relate to Brown's back pain, he prescribed Flexeril, a muscle relaxant. (Tr. 486.) At her February 11 appointment with Dr. Bandemer, Brown said that she was not having as much pain in her back. (Tr. 583.) She did, however, report pain on the right side of her thoracic region. (*Id.*) Brown was taking Vicodin every four hours and told Dr. Bandemer that Flexeril provided no significant relief. (*Id.*) Dr. Bandemer noted a normal standing flexion test, a normal Gillet test, a negative straight-leg-raise test, and 5/5 strength in Brown's legs. (*Id.*) Brown, however, did have "fullness on the right lower thoracic area and tenderness with asymmetry." (*Id.*) Dr. Bandemer's impression was thoracic pain, "mostly myofascial in nature with structural asymmetry," and "[r]ight sacroiliac dysfunction, which is improving." (*Id.*) Dr. Bandemer

performed osteopathic manipulations, continued Brown on physical therapy, refilled Brown's Vicodin prescription, added Celebrex, and restarted Amrix. (*Id.*) He also prescribed an electrical stimulator. (*Id.*)

On February 18, 2009, Dr. Bandemer noted that Brown's symptoms were worse after sitting for a prolonged period and, when she stood up, she had pain at the sacroiliac joint. (Tr. 581.) He noted, "[o]n examination today, her exam is essentially unchanged." (*Id.*) He remarked, "At this point, I am very limited in what else we can try for her. She did not have any evidence of radiculopathy or abnormal findings on MRI. I have written [a prescription] for a lumbosacral corset to try and help stabilize her back. . . . She will continue with physical therapy . . . ." (*Id.*)

On February 24, 2009, Brown received her fourth epidural injection. (Tr. 594.) About three weeks later, Brown told Dr. Bandemer that her condition was about the same. (Tr. 579.) Brown described her pain like a "boot sticking in her back." (*Id.*) Brown was walking with a cane and her movements were "very slow and purposeful." (*Id.*) Dr. Bandemer provided additional injections, refilled Brown's Vicodin, and provided samples of Celebrex and Amrix.

*March 2009 Consultative Exam*

In March 2009, Dr. S. Orbi evaluated Brown for Michigan's Disability Determination Service, a state agency that helps the Social Security Administration evaluate claimants. (Tr. 381-84.) On exam, Brown's lumbar-spine range of motion was normal. (Tr. 383.) Brown's "[g]ait and station [were] intact," she was able to heel- and toe-walk, she could stand from squatting, and her straight-leg-raise test was negative. (Tr. 382.) Dr. Orbi did note "mild paravertebral muscle spasms in the lumbar area." (*Id.*)

*March 2009 Hospitalization for Abdominal Pain*

From March 26 to April 3, 2009, Brown was hospitalized. On March 26, Brown began having severe stomach pain. (Tr. 483.) She sought treatment from Dr. Kushner who noted "[rule/out] appendicitis" and called the emergency room. (*Id.*) While in the emergency room, Brown was "very anxious, crying, tearful." (Tr. 746.) A CT scan was ordered; the radiologist noted a probable right ovarian vein thrombosis and "[p]ost surgical changes of recent hysterectomy with areas of decreased attenuation thought to represent possible hematoma versus post surgical changes of the vaginal cuff." (Tr. 732.) In providing her medical history, Brown explained that six weeks after the physician had performed her hysterectomy in October 2008, she had returned for a follow-up with Dr. Coleman because of abdominal pain. (Tr. 746.) "[A]pparently [Brown] became angry and upset with Dr. Coleman. She refused to go back and see her." (*Id.*)

While hospitalized, Brown had a consult for her spine; the consulting physician noted that neither a lumbar-spine x-ray nor a pelvic CT scan showed "acute osseous pathology." (Tr. 749.) His impression was "[l]umbar back pain chronic that is probably musculoskeletal in etiology. There is no evidence of any radiculopathy or myelopathy." (*Id.*)

Brown's discharge summary provides that, during her stay, Brown "at times acted out with drug seeking behavior and unusual complaints and confabulation" and that Brown had a "strange affect." (Tr. 765.) The physician noted that the hospital had started Brown on Coumadin, which eventually became "therapeutic." (Tr. 765-66.)

On April 10, 2009, upon receiving Brown's laboratory results, Dr. Kushner increased Brown's Coumadin dosage. (Tr. 716.)

7

*Brown Continues Her Treatment with Dr. Bandemer for Back Pain*

On April 28, 2009, Dr. Bandemer noted, "[Ms. Brown] continues to have discomfort in her right thoracic region and also right low back region. . . . The pain is still worse with any movements. She feels that she is not able to do any normal activities." (Tr. 577.) Dr. Bandemer's exam findings were "essentially unchanged." (*Id.*) Dr. Bandemer ordered a thoracic spine MRI "for completeness," referred Brown for acupuncture, and continued her medications. (*Id.*) Dr. Bandemer also prescribed Brown a cane. (Tr. 603.)

Douglas Lee, M.D., provided acupuncture treatment on May 6, 2009. Dr. Lee noted, "I did the meridian examination and it is surprising that she has extremely low energy output all over [her] body. Almost it looked like she might have fibromyalgia-type of problem by post diagnostics." (Tr. 575.)

*A Physician Reviews Brown's Medical File and Provides a Functional Assessment*

On May 7, 2009, Dr. Charles Edmonds reviewed Brown's medical file and offered a residual functional capacity assessment for the Social Security Administration. (Tr. 443-50.) Dr. Edmonds primarily focused on Brown's back condition. (*See* Tr. 444-45.) Dr. Edmonds thought that Brown could lift 20 pounds occasionally, 10 frequently, stand or walk for six hours in an eight-hour day, and engage in unlimited pushing and pulling. (Tr. 444.) He provided that Brown had some postural limitations, including that she could only "occasionally" stoop, kneel, crouch, or crawl. (Tr. 445.)

*June 2009 Hospitalization for Abdominal Pain*

From June 11 to June 14, 2009, Brown was again hospitalized for abdominal pain. An abdominal CT scan and a pelvic ultrasound were taken. (Tr. 697-701.) The radiologist interpreting the CT scan thought that, in comparison to the March 2009 study, there was "[c]ontinued evidence

8

of [an] oval area of mixed attenuation . . . . Its exact etiology is unclear. This may represent a right ovarian vein thrombus which has not significantly changed in the interim." (Tr. 698.) The pelvic ultrasound, however, showed a "significant[] change[]" since the March 2009 study: it appeared that Brown's right ovary was now much larger than her left. (Tr. 700.)

During her hospitalization, Brown had a number of medical consultations. A physician, possibly an orthopedist, evaluated Brown for back pain. (Tr. 462-63.) Brown had "minimal tenderness" at her right sacroiliac joint as well as at the lumbosacral junction. (Tr. 463.) But Brown had no radicular symptoms and full motor strength. (*Id.*) A neurologist also evaluated Brown. (Tr. 468-71.) Brown reported that her back pain had improved since March; her "most prominent" complaint to the neurologist was right knee pain. (Tr. 468.) The neurologist noted that Brown had "5/5 strength in all myotomes, intact reflexes and sensation" and Brown's gait was "stable." (Tr. 470.) Her assessment was "[p]seudo-weakness secondary to pain." (*Id.*) The neurologist "[did] not suspect radiculopathy." (*Id.*)

Brown was discharged on June 14, 2009. (*See* Tr. 521-22.) Her discharge diagnoses were abdominal pain, ovarian cyst and possible ovarian vein thrombosis, hypertension, asthma, dyslipidemia, and "[h]istory of medical noncompliance." (Tr. 521.) The discharging physician noted, "She was on Coumadin, which had a subtherapeutic level, and there was a questionable ovarian vein thrombosis. She was going to have outpatient followup with her OB/GYN." (*Id.*)

On June 24, 2009, Brown had a follow-up appointment with Dr. Kushner. Dr. Kushner noted that Brown needed some medications refilled and that she complained of abdominal pain. (*Id.*) He diagnosed Brown with ovarian cyst, high blood pressure, and coagulopathy. (Tr. 459.)

On July 19, 2009, another CT scan of Brown's abdomen was performed. (Tr. 552.) In

9

comparison to the June 2009 study, the radiologist noted, "[a]gain demonstrated is a hypoattenuated oval region with the right pelvis of indeterminate significance." (Tr. 553.) He also noted "[p]elvic phleboliths" (Tr. 553), i.e., calcification within the veins.

*"Most Likely Fibromyalgia"*

Two days later, Brown saw a physician in Dr. Kushner's office. (Tr. 554.) Brown reported pain in her back and joints. (*Id.*) The physician wanted to "rule out" fibromyalgia and diagnosed hypertension, panic disorder, and hyperlipidemia. (Tr. 554.) The doctor referred Brown to Dr. Paul Wenig, a rheumatologist. (*Id.*)

Dr. Wenig evaluated Brown on August 3, 2009. He noted, "The pain is all over. Her right ear aches and she has sometimes a real problem if she touches it. She has had no joint swelling. She has [morning] stiffness which lasts 5 to 10 minutes." (Tr. 542.) Brown reported pain upon compression of joints in her left-thumb, the fifth finger of her left hand, and fourth finger of the right hand. (Tr. 543.) Dr. Wenig remarked, "There are multiple tender points in both the upper and lower extremities." (*Id.*) In an August 3, 2009 letter to Dr. Kushner, Dr. Wenig wrote, "My final diagnosis is: . . . most likely fibromyalgia." (Tr. 541.)

*Second Diagnostic Laparoscopy and Cyst Removal*

Pursuant to a referral from Dr. Kushner (or a physician in his office), Brown saw Dr. John Parmely, apparently a surgeon, regarding her ovarian issues. (Tr. 536.) On August 10, 2009, Dr. Parmely wrote to Dr. Kushner:

> The patient's CT scans from [March, June, and July 2009] have all been reviewed. . . . There does not appear to be any evidence of right ovarian vein thrombosis, but there is an oval mass area of mixed attenuation anterior to the right psoas musculature. This may be ovarian in etiology or other pelvic mass effect. However, it is not ovarian vein thrombosis. I have already called the patient on the

10

phone today and told her to stop her Coumadin.

(Tr. 536.) The next day, Brown had a consult with Dr. Parmely who informed her of the risks and benefits of a diagnostic laparoscopy. (Tr. 538.) On August 20, 2009, Dr. Parmely performed the procedure. (Tr. 535.) On September 1, 2009, Dr. Parmely wrote to Dr. Kushner: "Ms. Brown . . . underwent laparoscopic resection of a right pelvic mass and was found to have a large right hemorrhagic corpus luteal cyst. The appendix was also removed because of chronic right pelvic pain. . . ." (Tr. 532.)

*Continued Treatment with Dr. Bandemer and Dr. Kushner for Pain*

In September 2009, Brown returned to Dr. Bandemer. (Tr. 571-72.) He noted, "She is still having a lot of chronic pain, primarily in the right thoracic region, but also in the lower back. . . . She has been diagnosed with fibromyalgia. She is on Lyrica, [but has] not noticed any significant improvement." (Tr. 571.) Dr. Bandemer's exam findings were "essentially unchanged": Brown walked with a cane, had slow movements with all her testing, had some thoracic and sacroiliac tenderness, a negative straight-leg-raise test, and "essentially full strength" with some "give-way weakness throughout." (*Id.*) Dr. Bandemer continued Brown on Lyrica, refilled her Vicodin prescription, gave her a "Flector patch" for her thoracic pain, and provided that Brown should continue using the TENS unit. (*Id.*)

Also in September 2009, Dr. Parmely (the surgeon who had performed Brown's second laparoscopy) performed a colonoscopy; it revealed hemorrhoids. (Tr. 530.)

In October 2009, Dr. Kushner evaluated Brown and opined on her ability to function. On October 1, Brown saw Dr. Kushner for back and neck pain and body aches. (Tr. 529.) Dr. Kushner noted, "always hurting" and "gets meds from Dr. Bandemer." (Tr. 529.) His impressions were

menopause and depression. (Tr. 529.) The next day, Dr. Kushner wrote the following on a prescription form: "Ms Brown has a diagnosis of fibromyalgia and depression. At this time, she is unable to work." (Tr. 604.) About a week later, Dr. Kushner completed a housing-assistance form. He wrote: "Diagnosis: Fibromyalgia; Herniated disc; Hemorrhoids[.] Prognosis: Fair and Depression. This [patient] needs assistance preparing meals and basic upkeep of her house." (Tr. 606.)

From October 2009 through January 2010, Brown saw Dr. Bandemer four times. (Tr. 564-70.) On October 8, Brown continued to report pain in her thoracic area between her shoulder blades and pain in her lower back. (Tr. 570.) Dr. Bandemer performed osteopathic manipulative therapy, prescribed a Duragesic patch, renewed Vicodin (which Brown had been taking up to five in a day), and wrote a prescription for a TENS unit (which Brown did not have or had not been using). (Tr. 570.) On October 29, Brown reported to Dr. Bandemer that her pain had not decreased. (Tr. 568.) She was taking MS Contin every 12 hours as well as Vicodin every four hours. (*Id.*) Dr. Bandemer wrote a prescription for Lyrica thinking that it "may help with [her] fibromyalgia type symptoms." (*Id.*) On November 25, Brown told Dr. Bandemer that her pain had improved some. (Tr. 566.) Dr. Bandemer's impressions were "[c]hronic thoracic and lumbar pain, most likely muscular in nature with no neurologic deficits on exam" and "[q]uestionable depression and fibromyalgia-type symptoms." (Tr. 566.) Dr. Bandemer encouraged Brown to start taking Lyrica twice a day, refilled her MS Contin and Vicodin prescriptions, and told Brown to "stay as active as possible, primarily stretches for her back." (Tr. 567.) At her January 2010 appointment with Dr. Bandemer, Brown reported taking Vicodin up to five times a day. (Tr. 564.) Because of side effects, Brown was not taking MS Contin and was taking Lyrica only once every other day. (*Id.*) Brown's exam was

"essentially unchanged." (*Id.*)

Brown also saw Dr. Kushner in January and February 2010. (Tr. 515.) In January, Brown complained of stomach pain and headaches. (*Id.*) Dr. Kushner noted constipation and "[rule out] mass low [abdomen]." (*Id.*) Subsequent chest and abdomen x-rays were normal. (Tr. 511-12.) At a February 3, 2010 follow-up with Dr. Kushner, the physician's impressions were vaginitis, high blood pressure, and constipation. (Tr. 510.)

Brown continued to have regular visits with Dr. Bandemer for the remainder of the disability period. In February 2010, Dr. Bandemer noted that "overall[,] [Ms. Brown's] symptoms are essentially the same." (Tr. 562.) Brown reported that Savella, Flexeril, and Lyrica made her drowsy. (*Id.*) About three weeks later, Dr. Bandemer noted that Brown had "diffuse areas of tenderness to palpation in multiple areas bilaterally and in the upper and lower body" and a "depressed affect," but that Brown's exam was "essentially . . . normal." (Tr. 560.) That same day, MRIs were taken of Brown's thoracic and lumbar spine. (Tr. 495-96.) The radiologist thought that the lumbar-spine MRI showed "[n]o apparent interval change" since the November 2008 study, that Brown had "[m]ild . . . disc bulging" in her thoracic spine causing "a small anterior thecal sac impression," and that there was a "signal abnormality in [Brown's] left ovary" that could represent "a hemorrhagic follicle or endometrioma." (Tr. 496.) In June 2010, Dr. Bandemer noted, "Since her last visit with me, overall her pain is slightly improved using the Duragesic patch[;] however, she feels that they wear off after about two days." (Tr. 776.) In July 2010, Dr. Bandemer remarked that Brown had "been doing fairly well on her Duragesic and Vicodin ES." (Tr. 777.) In the letter Dr. Bandemer wrote to Dr. Kushner after every exam, the specialist stated, "She has also been switched to Cymbalta by you and is no longer taking the Lyrica and overall she feels she has good improvement." (*Id.*) In August 2010, Dr.

Bandemer noted, "overall [Ms. Brown] is essentially the same." (Tr. 779.) He also opined, "I believe she . . . has some degree of fibromyalgia." (Tr. 779.) In September 2010, Dr. Bandemer informed Dr. Kushner that Brown was "still having [a] lot of pain in the thoracic area [and] sometimes it travels into the arms, but there is no numbness or tingling." (Tr. 780.) In October 2010, Brown told Dr. Bandemer that Savella had made her "comatose" for about three days and that Lyrica and Cymbalta also had adverse side effects. (Tr. 781.) Dr. Bandemer increased the dosage of Brown's Duragesic patch and renewed her Flexeril prescription. (Tr. 782.) He wrote, "I do agree with her seeing a psychiatrist as I feel she does need other medications to help with her mood as I feel there are some underlying issues contributing to her pain." (*Id.*) At her last visit with Dr. Bandemer reflected in the administrative record, Dr. Bandemer wrote, "Since her last visit with me, she is doing very well." (Tr. 783.) Although she was still having some pain and tightness, Brown reported being able to do more things around her home. (Tr. 783.)

In December 2010, Brown apparently saw Dr. Kushner for blood testing and to ask Dr. Kushner to complete a disability form. (Tr. 620, 607-11.) In completing a "Fibromyalgia Residual Functional Capacity Questionnaire" Dr. Kushner opined that Brown had "pain all over" and that her pain was "severe." (Tr. 607-08.) He thought that Brown was incapable of "even 'low stress' jobs." (Tr. 609.) He provided that Brown could sit for at most 10 minutes at one time and less than two hours total in an eight-hour workday; similarly, Dr. Kushner said that Brown could stand for five minutes at one time, and less than two hours total in an eight-hour workday. (Tr. 609.) According to Dr. Kushner, Brown could rarely lift less than 10 pounds, and "[n]ever" lift 10 pounds or more. (Tr. 610.)

14

*Mental Health Treatment*

Brown also received treatment for her mental health during the disability period.

In October 2008, Brown underwent an "initial psychiatric evaluation" with "A. Morgan" a psychiatrist. (Tr. 363-64.) Brown informed Dr. Morgan that she had mental-health issues dating back to 2001, when a psychiatrist had placed her on Xanax for severe anxiety. (Tr. 363.) Brown reported depression, crying, and withdrawing socially. (*Id.*) The psychiatrist thought that Brown's memory was "[g]rossly intact" and that her intelligence was "average." (Tr. 364.) Dr. Morgan assessed major depressive disorder, recurrent, moderate, and anxiety disorder, not otherwise specified. (Tr. 364.) The psychiatrist assigned Brown a Global Assessment of Functioning ("GAF") score of 42. (*Id.*)

Brown then attended therapy for two months. In November 2008, the therapist provided that Brown's mood was "sad" and her affect "tired." (Tr. 361.) Brown reported back pain during her session and had to excuse herself to take pain medication. (*Id.*) Brown also attended two group therapy sessions in November. (Tr. 360-61.) At a December 2008 medication review, a nurse noted that Brown was coherent and logical but "appear[ed] to be on the verge of crying during [the] entire visit." (Tr. 360.) At therapy in December, Brown's mood was described as "frustrated" and her affect "depressed, in pain." (Tr. 360.) Brown was "frustrated about her family members thinking that she is faking her pain, faking her distress because of the way she keeps herself together." (*Id.*)

In March 2009, in connection with her application for disability benefits, Dr. Basivi Baddigam evaluated Brown and Dr. Zahra Yousuf reviewed Brown's medical file and then opined on her mental residual functional capacity. (Tr. 385-405.) At her evaluation with Dr. Baddigam, Brown told the psychiatrist that she had been suffering from 10-minute-long panic attacks three times per month over the last eight years. (Tr. 385.) Brown also reported being depressed at least

one week per month. (*Id.*) Upon performing a mental-status exam, Dr. Baddigam diagnosed Brown with dysthymic disorder, in partial remission; panic disorder with agoraphobia; and assigned a GAF score of 55. (Tr. 387.) Upon reviewing Brown's file, Dr. Yousuf opined that Brown had "mild" restrictions in activities of daily living, "mild" difficulty maintaining social functioning, "moderate" difficulties in concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. 398.) Dr. Yousuf further opined, "totality of evidence in [the claimant's] file indicates that the claimant does have a [medical determinable impairment] of depression and anxiety but currently her functioning and [mental status exam] are intact and claimant retains the mental capacity to meet the basic demands for simple unskilled work." (Tr. 404.)

In late March 2009, during Brown's first hospitalization for abdominal pain, she was evaluated by a psychiatrist, Dr. John Gherman. (Tr. 427-29.) Brown informed Dr. Gherman that, although she had experienced "mood swings" for nine years, they had worsened in recent months. (Tr. 427.) Brown also reported racing thoughts. (*Id.*) Dr. Gherman noted that Brown's "mood lability [was] actually mood reactivity": "It is not out of the blue, it depends on what the situation is, and if a person in her life has made negative remarks or criticized the patient she gets very upset." (Tr. 427.) Dr. Gherman's impressions were mood disorder, not otherwise specified; a rule-out diagnosis of bipolar disorder, "or even mood disorder secondary to her general medical condition"; a questionable somatization disorder;[2] history of possible posttraumatic stress disorder; personality disorder, not otherwise specified, with borderline traits if not borderline personality disorder. (Tr.

---

[2]"Somatization disorder is a long-term (chronic) condition in which a person has physical symptoms that involve more than one part of the body, but no physical cause can be found. The pain and other symptoms people with this disorder feel are real, and are not created or faked on purpose (malingering)." Medline Plus, *Somatization Disorder*, http://www.nlm.nih.gov/medlineplus/ency/article/000955.htm (last visited Dec. 6, 2013).

428-29.)

In December 2009, a therapist completed, and a psychiatrist reviewed, an intake assessment of Brown. (Tr. 455-57.) Brown reported that Dr. Kushner had diagnosed her with bipolar in March 2009, that doctors "never listened" to her, and that Dr. Kushner was the first to understand and prescribe appropriate medications. (Tr. 455.) Brown described obsessive-compulsive symptoms related to germs and said she felt uncomfortable in public places with "all those germs." (Tr. 455.) Although Brown's mood and affect were "depressed, fatigued, [and] in pain," her thought processes were coherent, her short- and long-term memory "intact," her judgment "fair," and her intelligence "average." (Tr. 455.)

In March 2010, Brown underwent a psychiatric evaluation. (Tr. 451-53.) The psychiatrist thought that Brown's psychomotor behavior was "normal," her attitude "cooperative," her speech "slow," affect "full," cognition "alert," insight "fair," and judgment "fair." (Tr. 453.) She was assigned a GAF score of 45. (*Id.*)

### C. Testimony at the Hearing Before the ALJ

At her December 2010 hearing before ALJ Roshak, Brown testified to how her impairments prevented her from working. Brown said that she had pain in her back, lower stomach, legs, arms, and hands. (Tr. 34-35.) When asked to rate her pain on a ten-point scale, Brown said, "about seven." (Tr. 36.) Brown also testified that her medication caused side effects of nausea (to the point of vomiting), dizziness, and sleepiness. (Tr. 37.) According to Brown, her medications caused her to nap "[f]our times a day" for "[a]bout an hour" each time. (*Id.*)

In terms of the functional limitations caused by her impairments, Brown stated that she stopped working as an assembler in 2008 because "I was having problems with my hands, standing

17

up, and focusing. I kept making mistakes on the line." (Tr. 31.) Brown said that if she were required to work a factory job, she would be able to stay on task only 10 percent of the time. (Tr. 37.) Brown stated that she could sit for ten minutes, stand for ten minutes, and walk "maybe a block." (Tr. 30.) When the ALJ asked Brown about the heaviest weight she could lift, Brown stated "[a]bout three pounds." (Tr. 30; *see also* Tr. 39.) Brown told the ALJ that she lived with her three children and that the oldest two, both adults, helped with the cooking, cleaning, shopping, and care of the four-year-old child. (Tr. 33-34, 38.) And because Brown had trouble getting out of bed "[e]very day," Brown's adult daughter helped her with that. (Tr. 36.) Brown's daughter also helped Brown wash her back and put on her medication patches. (*Id.*)

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations he thought approximated Brown's. The vocational expert testified that if Brown's testimony of "exertional limitations" were fully credible, Brown could nonetheless work as an information clerk, identification clerk, and video surveillance monitor. (Tr. 41.) The ALJ later clarified with the expert that these jobs were all "sedentary, unskilled." (Tr. 42.) The vocational expert also testified that if Brown's testimony about napping were credited, there would be no jobs she could perform. (Tr. 41.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

18

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Roshak applied the above framework as follows. At step one, he found that Brown had engaged in substantial gainful activity after her alleged disability onset date of September 1, 2007. (Tr. 12.) In particular, based on Brown's self-reported earnings, the ALJ concluded that Brown "continued to work at substantial gainful activity levels through 2008." (Tr. 13.) Nonetheless, because more than 12 months had passed since Brown last reported any earnings, the ALJ continued

19

with the five-step analysis. (Tr. 13.) At step two, the ALJ found that Brown had the following severe impairments: "fibromyalgia, mild degenerative disc disease with minimal disc bulging and annular tear at L5-S1, mild intervertebral disc bulge at T11-T12 with small anterior thecal sac impression, major depressive disorder and an anxiety disorder with panic attacks." (*Id.*) Next, ALJ Roshak concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 13.) Between steps three and four, the ALJ determined that Brown had the residual functional capacity to perform "sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)" so long as the work was "unskilled . . . as defined in 20 CFR 404.1568 and 416.968." (Tr. 16.) At step four, the ALJ found that Brown was not able to perform any past relevant work. (Tr. 19.) At step five, the ALJ, relying on vocational expert testimony, found that sufficient jobs existed in the national economy for someone of Brown's age, education, work experience, and residual functional capacity. (Tr. 19.) The ALJ therefore concluded that Brown was not under a "disability" as defined by the Social Security Act from the alleged onset date of September 1, 2007, through the date of his February 22, 2011 decision. (Tr. 20.)

## III. ANALYSIS

This case has an uncommon procedural posture. In January 2013, soon after the Commissioner docketed the transcript of the administrative proceedings, this Court issued a scheduling order directing Brown to file a summary-judgment motion in March 2013 and the Commissioner to file hers in April 2013. (Dkt. 14.)  But neither party filed a motion. So, in May 2013, this Court, consistent with prior practice, issued an order informing the parties that a report and recommendation would be forthcoming "based on the Transcript." (Dkt. 15); *see DeLay v. Comm'r of Soc. Sec.*, No. 12-11134, 2013 WL 692757 (E.D. Mich. Jan. 30, 2013) (Michelson, M.J.)

(declining to dismiss a social security appeal for failure to prosecute where the plaintiff proceeded pro se and, therefore, lacked the benefit of counsel on the consequences of failing to file a motion for summary judgment), *report and recommendation adopted*, 2013 WL 687040 (E.D. Mich. Feb. 26, 2013); *Gilmore v. Comm'r of Soc. Sec.*, No. 10-14204, 2011 WL 5507407 (E.D. Mich. Oct. 12, 2011) (Michelson, M.J.), *report and recommendation adopted*, 2011 WL 5546300 (E.D. Mich. Nov. 10, 2011) (same); *see also Wright v. Comm'r of Soc. Sec.*, No. 09-CV-15014, 2010 WL 5420990 (E.D. Mich. Dec. 27, 2010) (Friedman, J.) (rejecting report and recommendation to dismiss social security disability appeal for plaintiff's failure to prosecute, reviewing the record, and remanding for an award of disability benefits); *Mosely v. Astrue*, No. 2:12-CV-836, 2013 WL 1316013, at *1 (S.D. Ohio Mar. 28, 2013) ("In the past, especially when dealing with a pro se litigant (that is, someone who is not represented by an attorney), the Court has done a general review of the Commissioner's decision to make sure there are no obvious errors even when the plaintiff has not filed anything in this Court but the complaint. . . . The Court will do the same here.").

The Court is mindful, however, that its role is limited and that it "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Accordingly, this Court believes that where, as here, a social security claimant is proceeding pro se in a federal-court appeal, but has not challenged any particular finding of the Commissioner, its limited role is to (1) review the administrative record and the ALJ's narrative and then (2) determine whether the ALJ's findings are supported by substantial evidence or whether the ALJ made an obvious legal error. *See Mosely*, 2013 WL 1316013, at *1. Ultimately, "[i]f the

administrative decision is legally sound and if it is supported by the kind of evidence a reasonable person could rely on, this Court has to affirm the Commissioner's decision to deny benefits." *Mosely*, 2013 WL 1316013, at *1; *see also Longworth*, 402 F.3d at 595.

Here, a review of the administrative record reveals readily discernible legal error. In particular, the administrative record lacks an expert opinion on whether Brown's physical impairments (alone or combined with her mental impairments) medically equal any listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Because this is clear error, and because the record is not so lacking in medical findings that a finding of equivalence is implausible, this Court recommends remand.

Social Security Ruling 96-6p, and decisions from this judicial district, require a medical expert's opinion on the issue of equivalence:

> [L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

SSR 96-6p, 1996 WL 374180, at *3 (1996); *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *4 (E.D. Mich. Sep. 25, 2013) (collecting cases and remanding because there was no expert medical opinion on the issue of equivalence); *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *11 (E.D. Mich. July 9, 2013) (remanding for an expert opinion at step three); *see also* 20 C.F.R. § 416.926(c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."). Although the Sixth Circuit has not directly addressed the issue, it has reasoned that, "[g]enerally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Retka v. Comm'r of Soc. Sec.*, 70

F.3d 1272 (6th Cir. 1995).

Social Security Ruling 96-6p goes on to provide guidance as to the type of documents that may constitute a medical expert's opinion on the issue of equivalence:

> The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.

SSR 96-6p, 1996 WL 374180, at *3 (1996).

This Court has reviewed the record and concludes that it does not contain a medical expert's opinion on whether the combination of Brown's mental *and physical impairments* are equal to any listed impairment. It is true that the administrative record contains a "Disability Determination and Transmittal Form" as referenced in SSR 96-6p. (Tr. 52, 53.) And the Court acknowledges that the Transmittal Form provides "Primary Diagnosis[:] Disorders of Back[,] Discogenic & Degenerative." (*Id.*) Further still, the Transmittal Form is signed by Dr. Yousuf, who, although a specialist in psychiatry, is nonetheless a medical doctor. (*Id.*) The problem, however, is that the signature box of the Transmittal Form (titled "physician or medical spec. signature") says "see PRTF dated 03/26/2009." (Tr. 52, 53.) A review of the referenced Psychiatric Review Technique Form, along with the associated Mental Residual Functional Capacity Form, reveals that Dr. Yousuf focused exclusively on Brown's mental impairments. (*See* Tr. 388, 391, 393, 400, 404.) Indeed, it appears that Dr. Yousuf did not even review any of the medical evidence pertaining to Brown's physical

23

impairments.

Nor—in this case—does the Physical Residual Functional Capacity Assessment completed by Dr. Edmonds suffice as an expert opinion on equivalence. First, the Assessment does not mention any listing or otherwise indicate that Dr. Edmonds considered the issue of equivalence. (*See* Tr. 443-50); *Barnett v. Barnhart*, 381 F.3d 664, 667, 671 (7th Cir. 2004) (summarizing medical evidence including a residual functional capacity assessment by "Dr. A. Dobson" and subsequently concluding that Dr. Dobson did not "opine[] on the issue" of equivalence). Second, Dr. Edmonds' opinion was made before Brown was diagnosed with fibromyalgia. Thus, Dr. Edmonds had no reason to consider whether the combination of Brown's spinal problems, psychological conditions, *and fibromyalgia* medically equaled any of the listed impairments. *See* S.S.R. 12-2p, 2012 WL 3104869, at *6 (2012) ("[Fibromyalgia ('FM')] cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.").

Finally, this is not a case where the Court feels comfortable analyzing equivalence in the first instance. Indeed, it may be that this Court should never do so. *Barnett*, 381 F.3d at 670 ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); *Stratton v. Astrue*, No. 11-CV-256-PB, 2012 WL 1852084, at *12 (D.N.H. May 11, 2012) ("'The basic principle behind SSR 96-6p is that while an ALJ is capable of reviewing records to determine whether a claimant's ailments meet the Listings, expert assistance is crucial to an ALJ's determination of whether a claimant's ailments are equivalent to the Listings.'" (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D.Tex. May

23, 2008))); *Freeman v. Astrue*, No. 10-0328, 2012 WL 384838, at *5 (E.D. Wash. Feb. 6, 2012) ("Neither the ALJ nor this court possesses the requisite medical expertise to determine if Plaintiff's impairments (including pain) in combination equal one of the Commissioner's Listing."). But even if, in some cases, the administrative record permits a lay-person to conclude that the record does not demonstrate equivalence, this is not such a case. The administrative record, summarized in detail above, indicates that Brown has significant physical impairments that could plausibly equal a listing. Dr. Kushner opined that Brown's fibromyalgia resulted in severe functional limitations. It is true than the ALJ assigned Dr. Kushner's opinion "little probative weight." (Tr. 17.) But if Dr. Kushner's opinion had been considered by a medical expert opining on equivalence, it may not have be so severely discounted by the expert.[3] The Court also notes that, according to Dr. Bandemer's records, Brown tried various medications, injections, physical therapy, braces, and a stimulator and none resulted in a significant reduction in her pain (at least for any significant portion of the disability period). The Court therefore believes that the appropriate result is to remand this case for a medical opinion on the issue of equivalence.

Because the Court has found reversible error at step three, it does not opine on the remainder of the ALJ's disability determination.

---

[3]Dr. Kushner had a long treating history with Brown. Indeed, Dr. Kushner treated her during the entirety of the disability period. Moreover, each time Dr. Bandemer evaluated Brown, Dr. Kushner was informed of the specialist's findings. Dr. Kushner also knew about Brown's hospitalizations. And the primary-care physician was responsible for managing some of Brown's medications. There are, therefore, good reasons to defer to Dr. Kushner's opinions on Brown's ability to function. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) ("[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding.").

## IV. CONCLUSION AND RECOMMENDATION

In short, a review of the record reveals that the ALJ deciding Brown's case committed legal error by failing to obtain a medical expert's opinion on whether Brown's impairments, in combination, medically equaled one of the Social Security Administration's listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. As such, the Court RECOMMENDS that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED for an opinion on equivalence and for the ALJ to then reevaluate his step-three findings.

## V. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the

response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  December 10, 2013


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 10, 2013.


s/Jane Johnson
Deputy Clerk

27